**In the Matter of Terrilyn C. RIVERS, Debtor.**

**Terrilyn C. RIVERS, Plaintiff,**

v.

**UNITED STUDENT AID FUNDS, INC., Defendant.**

**Bankruptcy No. 96–41655.**
**Adversary No. 96–04212A.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Sept. 8, 1997.

Barbara B. Braziel, Savannah, GA, for Debtor.

Amy Lee Copeland, Savannah, GA, for Creditor.

Sylvia F. Brown, Savannah, GA, Chapter 13 Trustee.

## MEMORANDUM OPINION

James D. Walker, Bankruptcy Judge.

This matter comes before the Court on Complaint to Determine Dischargeability by Terrilyn C. Rivers ("Debtor"). The debt in question is a consolidated student loan held by United Student Aid Funds, Inc. ("Defendant"). This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). After considering the pleadings, evidence presented and applicable authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Debtor incurred student loans in the course of her education as an undergraduate and graduate student. She now holds a Master of Social Work Degree and is employed in a capacity appropriate to her degree at Memorial Hospital in Savannah, Georgia. Debtor filed this adversary proceeding in order to determine the dischargeability of her consolidated student loan debt held by Defendant. The balance remaining on the loan is approximately $55,000. The debt is repayable at the rate of $426.72 per month at 9% interest. Under these terms, it will take Debtor approximately thirty years to repay the loan debt.

Debtor has one child 13 years old which she supports without any assistance from the child's father. Debtor has not pursued the father for support. It appears that any such action would be fruitless given the father's sporadic record of gainful employment.

Debtor's annual salary is $30,000, resulting in net pay of $1,700 per month after necessary deductions. She contends that her monthly living expenses amount to $1,400 per month. Debtor's plan payments are $397 per month. The plan provides for payment in full of the debt secured by the recently purchased automobile and, further, provides a nominal dividend to unsecured creditors.

Shortly before bankruptcy, Debtor purchased a new 1996 Honda Civic. This purchase increased Debtor's monthly car payment of $350 to about $422. Debtor contends that it was necessary to buy the new car because her old one had developed mechanical problems. Defendant maintains that this expense was unnecessary. The Court finds that this expenditure is neither extravagant nor excessive in view of Debtor's living circumstances.

Defendant has questioned the necessity of several of Debtor's other living expenses including $28 per month for cable television service, $50 per month for long distance telephone calls, $100 per month for clothing, and $115 per month for dry cleaning. The Court finds that the amount for dry cleaning, while a bit high, is not unreasonable when considered together with the clothing expense. As for the cable and long distance expenses of $78 per month, even if the Court were to discount these amounts to a modest level, the resulting savings would not be significant enough to influence the outcome of this case.

The Court concludes that the living expenses as reflected in Schedule J are modest and appropriate to her personal and voca-

tional circumstances. Furthermore, while the budget process is useful and necessary to examine a debtor's disposable income, it should not obscure the fact that at this income level, many of the stated budget items are estimated based, not on actual need, but instead, on available funds. Highlighting one seemingly overstated item such as $50 per month for long distance telephone charges and omitting understated items like $38 for medical/dental expense and $0 for recreation for two people is an exercise with obvious limitations. This budget of $1,400 per month for a mother and teenaged child reflects a minimal standard of living.

It is certain that Debtor will be unable to make the required loan payments in the near future. It is, however, equally certain that her educational preparation has equipped her with the skills which, when combined with a continuing satisfactory job performance, should result in compensation at increasingly higher levels in the future. This increasing compensation should make it possible for Debtor to repay a substantial portion of the student loan debt.

### Conclusions of Law

Debtor seeks a determination of dischargeability as to her student loan. Educational loans are nondischargeable in bankruptcy unless: (1) it "first became due before more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition;" or (2) "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8)(A) & (B). The seven year exception is not available in this case. Debtor asserts, under the latter exception to nondischargeability, that having to repay approximately $55,000 in student loans will impose

an undue hardship on her and her dependent child.

■ The first step in the analysis is to determine whether discharge under section 523(a)(8)(B) is an all-or-nothing proposition. The notion of "undue hardship" is directly related to the amount of the debt. Some courts have held that the total educational debt is either dischargeable or nondischargeable.[1] Other courts have recognized a bankruptcy court's equitable power to discharge a portion of the debt, while leaving the remaining amount nondischargeable.[2] This Court is in agreement with the latter cases which recognize a bankruptcy court's ability to order a partial discharge of a student loan under certain circumstances.[3]

In holding that partial discharge of student loans is permitted in bankruptcy, this Court was most persuaded by the reasoning of *Heckathorn v. United States (In re Heckathorn)*, 199 B.R. 188 (Bankr.N.D.Okla. 1996). In that case, the court disagreed with other courts which held that the language of section 523(a)(8)(B) is "clear and unambiguous" to the extent that student loan discharge should be an all-or-nothing proposition. *See id.* at 194–95. Those courts most often support their holding by reasoning that if Congress had intended to allow a partial discharge of student loans, it would have specifically stated that discharge should be "to the extent" that payment imposed an undue hardship. *See, e.g., Shankwiler v. National Student Loan Marketing (In re Shankwiler)*, 208 B.R. 701, 707–08 (Bankr.C.D.Cal.1997). The *Heckathorn* court explained that, by themselves, the words "undue hardship" suggest a matter of degree. The court reasoned that "[f]inancial hardship is not all-or-nothing, but is more or less. The load may be made bearable by reducing, rather than eliminating it." *Heckathorn*, 199 B.R. at 195.

1. *See, e.g., Shankwiler v. National Student Loan Marketing (In re Shankwiler)*, 208 B.R. 701 (Bankr.C.D.Cal.1997); *Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690 (Bankr.W.D.Wash. 1996); *Skaggs v. Great Lakes Higher Education Corp. (In re Skaggs)*, 196 B.R. 865 (Bankr. W.D.Okla.1996); *Hawkins v. Buena Vista College (In re Hawkins)*, 187 B.R. 294 (Bankr.N.D.Iowa 1995).

2. *See, e.g., Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994); *Dennehy v. Sallie Mae (In re Dennehy)*, 201 B.R. 1008 (Bankr.N.D.Fla.1996); *Heckathorn v. United States (In re Heckathorn)*, 199 B.R. 188 (Bankr.N.D.Okla.1996).

3. The parties have stipulated to the application of such a rule in this case.

In addition, the *Heckathorn* court followed the rule of *United States v. Ron Pair Enterprises, Inc.,* stating that a court should not read and apply a statute in a manner which leads to an "absurd" result. 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290, 298–99 (1989). The *Heckathorn* court held that not allowing a bankruptcy court to order the partial discharge of student loans would be to read and apply section 523(a)(8)(B) in a manner that is "demonstrably at odds with the legislative scheme." 199 B.R. at 195. Specifically, the court stated the following:

> The policy underlying § 523(a)(8)(B) is dual. It requires accommodating *both* the discharge of debt in furtherance of [a] debtor's "fresh start" *and* the exception from discharge of student loan debts which may be repaid. It is demonstrably at odds with this dual purpose to require in all cases either complete discharge or complete nondischarge of student loan debt. Such all-or-nothing rule would in some cases result in insufficient repayment, in others in insufficient discharge, regardless of a debtor's particular circumstances including degree of hardship and future prospects—a result which would be "arbitrary and fortuitous" and, for purposes of § 523(a)(8)(B) absurd.

*Id.* at 196 (emphasis in original). The Court concurs with this analysis. Allowing partial discharge of student loans is the more equitable approach. Treating student loan dischargeability as an all-or-nothing proposition would, in some circumstances, yield absurd results in violation of the holding in *Ron Pair Enterprises.*

■ The next step in the analysis is to determine whether the undue hardship exception should apply so as to permit the discharge of all or some portion of the student loan debt. In this connection, the leading authority is *Brunner v. New York State Higher Education Servs. Corp (In re Brunner),* 46 B.R. 752 (S.D.N.Y.1985), *aff'd* 831 F.2d 395 (2d Cir.1987), which has previously been adopted in this District. *See Kemp v. Georgia Higher Education Assistance Corp. (In re Kemp),* No. 95–4032 (Bankr.S.D.Ga. Nov. 28, 1995) (Davis, C.J.). According to

*Brunner,* a debtor seeking discharge of a student loan through the undue burden exception must establish each of the following elements:

> (1) that the debtor cannot, based on current income and expenses, maintain a "minimal" standard of living for himself or herself and his or her dependents if forced to repay the loans;

> (2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and

> (3) that the debtor has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396.

The first element of the *Brunner* test is satisfied. Currently, plan payments are $397 per month. This amount already exceeds Debtor's disposable income which is listed as $351 in the schedules. If, in addition to plan payments, Debtor were forced to repay the student loans at a rate of $426.72 per month, she and her child could not "maintain a minimal standard of living."

■ The third element of the *Brunner* test is satisfied even though no payments were actually made towards the student loan debt. Debtor has not shown any bad faith as she has truly been financially unable to repay the loan. This inability to pay cannot be construed as bad faith.

■ The second element is the problem. It requires that the court determine if the "less than minimal standard of living" is likely to continue for a significant portion of the repayment period of the loan. Projecting income over a period of years is a very difficult undertaking for a finder of fact. Such projections rest as much on evidence of future income prospects, which in this case is scant to nonexistent, as on common sense and experience, which are both highly subjective. But such a view into the future is virtually mandated by the statute and the *Brunner* test in its requirement that the court determine if "[the] state of affairs is likely to persist for a significant portion of the repayment period," which is thirty years in this case.

■ A complicating factor in predicting Debtor's future disposable income is the fact that Debtor's minor child will reach the age of majority and should no longer need Debtor's financial support. While that might be a significant financial event to Debtor, it is likely over this same period of time that Debtor's "minimal standard of living" will increase with her maturing personal and vocational circumstances. Any other conclusion is unreasonable and, worse, unfair. Every debtor that appears in this Court has a slightly different budget. Debtors with higher incomes and longer employment tenures regularly demonstrate a higher minimum standard of living. If this Debtor's standard of living is to be fairly considered over such a long period, it cannot remain static for thirty years based on budget numbers advanced in 1997.

In trying to apply the second prong of the *Brunner* test, it appears that the test is not useful in a case where the "repayment period of the student loan" is as long as thirty years unless a debtor suffers from some kind of permanent earning disability. Debtor in this case will surely be able to repay a substantial part of this debt during the next thirty years. If the court were to apply the "all-or-nothing" analysis of discharge, then the second prong of *Brunner* would be satisfied in that the entire amount of the debt with accrued interest would be an impossible burden for Debtor, even with increasing earning ability. Thus, the debt would be discharged. This would be an unjust result for reasons stated earlier in this opinion. If the debt was reduced to a manageable amount, the second prong of the *Brunner* test would *not* be satisfied. Therefore, the court's task is to reduce the amount of the debt to a point where Debtor fails the second prong of the test. This is a difficult but not impossible task.

■ Inherent in the "substantial hardship" test is the idea that the educational loan must be approximately related to the Debtor's enhanced ability to earn money at the job for which he or she may have been prepared by the education. In other words, a lender who would make an educational loan to prepare a student for employment in a field where there were no jobs or jobs of minimal compensation can expect the debtor to have difficulty repaying the loan. This little gem of common sense can be said to have been engrafted into the "substantial hardship" test.

The Debtor in this case is an example of that truth. The field of social work is one which is not known to be highly remunerative. Debtor has earned a Master's Degree in social work (MSW). Employment in the field was a likely event for this Debtor. Jobs as social workers are usually offered by government entities with structured salary ranges. Debtor's employment at an annual pay rate of $30,000 is typical of such an employment opportunity. How much should be expended to educate the Debtor for a $30,000 per year entry level job? As noted earlier in this opinion, the amount of the debt to be repaid is related to the determination as to whether the repayment will create a substantial hardship; the less the debt the less the hardship.

No formula will yield a perfectly fair result. The variables are too numerous to consider with any measure of precision. Looking at the facts in this case realistically, Debtor is not likely to be able to make any significant repayment on this loan within the five year term of this Chapter 13 case. Looking out beyond the first five years, the Debtor should be able to pay at least as much towards the debt as she would have been paying towards the Chapter 13 plan payments. If the Debtor were to begin on the 61st month making payments on the student loan in the same amount as the plan payments of $397 per month and continue for a twenty-five year period, a total of $119,100 would be paid. If that amount were discounted to present value at the rate of 9%, the result would be approximately $31,000. This would represent a *minimum* which could be repaid in Debtor's present circumstances by allocating fully the same amount as plan payments for a twenty-five year period following completion of the Chapter 13 case. Debtor should be able and willing to increase the payment amount in later years, as her earning ability increases over the thirty year period of the loan. This would make

it possible to repay a principal sum of significantly more than the minimum stated above.

These calculations are valuable only insofar as they demonstrate the relationship between numbers and time. Attempting to make financial projections for a debtor over thirty years borders on sheer speculation. Yet, it appears, that the Code requires this speculation or something equivalent to it.[4]

Having determined that a partial discharge is to be allowed, the Court must next determine the amount to be discharged. Upon consideration of the facts of the case, the Court determines that a portion of Debtor's student loan debt should be discharged so as to leave a $40,000 debt to be repaid. This amount appears to be as much as Debtor could repay without "substantial hardship." The balance of the student loan will be determined to be dischargeable.

An order in accordance with this opinion will be entered on this date.

## ORDER

In accordance with the memorandum opinion entered on this date, it is hereby

ORDERED that $40,000 of the consolidated student loan owed by Terrilyn C. Rivers to United Student Aid Funds, Inc. is deemed to be nondischargeable under section 523(a)(8)(B); the balance of the loan will be deemed to be dischargeable.

**4.** An additional avenue of analysis is available. In the area of real estate mortgage financing, realtors frequently assist clients by projecting the amount of mortgage debt they can afford to pay in order to decide what price the client can afford for a home. This analysis is usually based on some multiple of the borrower's current gross income. Likewise, in considering educational debt in the context of earning ability, it appears reasonable to predict that educational debt like mortgage debt, may bear some relation to income in terms of predicting affordability. While a home buyer thinks in terms of a multiple of present gross income to predict the amount of an affordable mortgage, a student loan debtor must look beyond present income, to some point in the future, to predict the amount of student debt which can be repaid without hardship. This is because there must be some interval of time before a debtor might begin to fully enjoy the financial benefits of the investment in education. While the income prospects of debtors will vary, the method of analysis of their respective abilities to service debt might be the same. They should each be able to afford debt payments which bear some relation to the amount of income they can expect to receive. Testing hypothetical scenarios, and noting the use of a rule of thumb in the mortgage lending industry, it may be reasonable to conclude that a student loan debtor should be able to repay without "substantial hardship" a debt in the amount of the gross income he or she expects to receive in the tenth year of employment. When considering the various educational possibilities and the costs associated with them, this rule of thumb may offer an additional avenue of analysis to aid in determining whether the educational debt is out of proportion to the earning ability of the student. Such a formula serves here as a reality check against the mathematical projections noted earlier in this opinion.